UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

WILLIAM M. WILSON,                    §
                                      §
         Plaintiff,                   §
VS.                                   §    CIVIL ACTION NO. 2:13-CV-204
                                      §
FRANCES E. MCGINNIS, *et al*,         §
                                      §
         Defendants.                  §

## MEMORANDUM AND RECOMMENDATION
## TO GRANT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In this prisoner civil rights action, Plaintiff William M. Wilson claims that Frances E. McGinnis[1] and Dr. Theresa Whitt (collectively "Defendants") were deliberately indifferent to his serious medical needs because they failed to properly diagnose and timely treat his sleepwalking episodes despite his repeated falls, injuries, and complaints. Defendants have filed a motion for summary judgment to dismiss Plaintiff's claims arguing that the facts of this case refute any showing of deliberate indifference to his serious medical needs, and in the alternative, that they are entitled to qualified immunity because their actions were objectively reasonable. (D.E. 50). Plaintiff has filed a response in opposition. (D.E. 55).

For the reasons stated herein, it is respectfully recommended that the Court grant Defendants' summary judgment motion, and dismiss Plaintiff's claims with prejudice.

---

[1] Plaintiff identified Ms. McGinnis as a doctor but she is actually employed as a Clinical Nurse Specialist in Psychiatric/Mental Health. Both Defendants are/were employees of the University of Texas Medical Branch, Correctional Managed Care (UTMB-CMC), which is the state agency that provides medical services to prisoners in the Texas penal system.

I.      **Jurisdiction**

The Court has federal question jurisdiction.  *See* 28 U.S.C. § 1331.

II.     **Procedural Background**

Plaintiff is an inmate in the Texas Department of Criminal Justice, Criminal Institutions Division (TDCJ-CID), and is confined at the McConnell Unit in Beeville, Texas.  He filed this lawsuit on July 8, 2013, complaining of sleepwalking episodes that dated back as early as December 2010, and named as defendants Nurse McGinnis, Dr. Whitt, and a nurse practitioner, Lori Hudson.  (D.E. 1, p. 3).  On August 20, 2013, a *Spears*[2] hearing was held, and on August 28, 2013, Plaintiff filed a supplement to his complaint.  (D.E. 9).

By Order entered September 20, 2013, Plaintiff's claims that arose prior to July 8, 2011, were dismissed with prejudice as barred by the applicable two-year statute of limitations.  (*See* D.E. 11, p. 6-7).  Plaintiff's claims against the named defendants in their official capacities were dismissed as barred by the Eleventh Amendment.  *Id.* at 6.  Plaintiff's claims against Nurse Practitioner Hudson in her individual capacity were dismissed on the finding that she did not have the authority to order a permanent lower bunk pass or sleep study, nor could she prescribe medication to treat Plaintiff's sleepwalking.[3]  *Id.* at 9-10.  However, Plaintiff's claims against Nurse McGinnis and Dr.

_____

[2] *Spears v. McCotter,* 766 F.2d 179 (5th Cir. 1985).

[3] Plaintiff did not oppose the dismissal of Nurse Practitioner Hudson or seek reconsideration of that decision.

Whitt[4] in their individual capacities were retained, and service ordered on these two Defendants.  (D.E. 12).

On November 4, 2013, Nurse McGinnis filed her Answer and raised the defense of qualified immunity.  (D.E. 13).  On December 17, 2013, Dr. Whitt filed her Answer and also raised the qualified immunity defense.  (D.E. 24).

On March 6, 2014, pursuant to Fed. R. Civ. P. 26(a)(2), Defendants disclosed their expert witness and his findings to Plaintiff.  (D.E. 37).  On April 3, 2014, Plaintiff filed his "Rebuttal to the Findings and Opinions of Defendants' Expert Witness."  (D.E. 46).

On May 1, 2014, Defendants filed the instant motion for summary judgment. (D.E. 50, 51).  On May 23, 2014, Plaintiff filed his response in opposition to Defendants' summary judgment motion.  (D.E. 55).

## III.   Summary Judgment Evidence

In support of their summary judgment motion, Defendants offer:

Ex. A:     Amended Affidavit of Dr. Steven Bowers, Legal Coordinator for the University of Texas Medical Branch, Correctional Managed Care (UTMB-CMC) (D.E. 51-1, pp. 2-5);

Ex. B:     Relevant portions of Plaintiff's TDCJ medical records (filed under seal) (D.E. 51-2, pp. 3-99);

Ex. C:     UTMB-CMC Mental Health Services Departmental Procedures (D.E. 50-1, pp. 2-10); and

Ex. D:     Plaintiff's TDCJ housing records (D.E. 50-2, pp. 3-5).

---

[4] Dr. Whitt is no longer employed at the McConnell Unit, and her last known address was submitted under seal.  (D.E. 15).

In his summary judgment response (D.E. 55), Plaintiff requests that the Court refer to his rebuttal to the findings and opinions of Defendants' expert witness (D.E 46), and the affidavits of two former cellmates, James McLaughlin and Willie E. Preston. (D.E. 34).

Plaintiff's claims arising prior to July 8, 2011 are barred by limitations.  However, in evaluating Plaintiff's claims and Defendants' qualified immunity defenses, the time period when Plaintiff first began complaining of sleepwalking/seizures/falling from his bunk is relevant. The business records affidavit accompanying Plaintiff's medical records states that Defendants are offering Plaintiff's medical records from December 1, 2010 through November 13, 2013.  (*See* D.E. 51-2, p. 2).  However, out of the ninety-seven (97) pages offered, only one page is from December 2010.   (D.E. 51-2. p. 92). Therefore, the initial facts are taken from Plaintiff's uncontested supplemental complaint. (D.E. 9).

On December 21, 2010, Plaintiff fell from his upper bunk while asleep, injuring his face, knee and ribs.  (D.E. 9, p. 5).  Plaintiff's cellmate observed the incident and told Plaintiff he "looked like he was having a seizure."  *Id.*  Plaintiff had just recently begun taking Zoloft, an anti-depressant, and he wondered if his new medication may have caused the incident.  *Id.*

On December 24, 2010, Plaintiff reported to the infirmary complaining of soreness in his ribs from the fall, and he complained that he was having difficulty climbing into his upper bunk.  (D.E. 9, p. 5).  Plaintiff was issued a temporary lower bunk pass and scheduled to be seen by a provider.

On December 27, 2010, Plaintiff was seen by Dr. Herrera in the McConnell Unit infirmary. (D.E. 9, p. 5). Dr. Herrera issued Plaintiff a sixty (60) day lower bunk pass and ordered a mental health evaluation. *Id.* Plaintiff was already receiving mental health counseling on an outpatient basis via telemed counseling with Nurse McGinnis and he spoke with her that day. *Id.* Plaintiff told Nurse McGinnis about falling from the bunk and they specifically discussed sleepwalking as a possible cause. *Id.* Nurse McGinnis changed his antidepressant medication from Zoloft to Celexa. *Id.*

On January 5, 2011, Plaintiff's Health Summary for Classification form was changed to reflect that Plaintiff had a lower bunk restriction for sixty (60) days. (D.E. 51-2, p. 89).

On February 11, 2011, Plaintiff submitted a Sick Call Request (SCR) directed to Mental Health Services reporting:

> About a month ago I was having real bad hallucinations and seizure-like symptoms. I fell from my bunk and you changed my medication. I've started having those same problems again. I told the medical doctor about this last week, and he said to write you and put in for a follow-up. I don't know what is causing this and medical has not run any tests on me. This is very scary and dangerous 'cause I've hurt myself twice. Please help. Thank you.

(D.E. 51-2, p. 51). On February 14, 2011, Kimberly Maldonado with Mental Health Services (MHS) responded that Plaintiff had an appointment with Nurse McGinnis later in the month and she would be able to discuss his concerns at that time. *Id.* That same day, Plaintiff received a disciplinary case for fighting with his cellmate. Plaintiff was evaluated by Mental Health Services via telemed prior to being locked-up in pre-hearing

detention (PHD).  (D.E. 51-2, pp. 53-54).  Plaintiff told Mental Health Clinician Mario DePau that he had fallen from his bunk several times and he thought it was due to his medication.  *Id.* Mr. DePau noted that Plaintiff was requesting a change in his medication and had a scheduled appointment with Nurse McGinnis later that month, and cleared him for placement in PHD.  *Id.*

On February 23, 2011, while still in PHD, Plaintiff submitted a SCR stating that his medication was not working.  (D.E. 51-2, p. 55).  Plaintiff stated that he felt bad and was still hallucinating and falling out of his bunk at night.  *Id.* Plaintiff was seen by Mental Health counselors Kimberly Maldonado and Mario DePau via telemed.  (D.E. 51-2, pp. 56-58).  Plaintiff told them that he had episodes where he fell on the floor and would not remember what happened.  *Id.*  He had seizures as a child but he grew out of them.  *Id.*  Ms. Maldonado and Mr. DePau instructed Plaintiff to relay this information to Nurse McGinnis at his next appointment. *Id.*

On February 24, 2011, Plaintiff was seen by Nurse McGinnis via telemed for a routine follow-up psychiatric evaluation.  (D.E. 51-2, pp. 59-63).  Defendant McGinnis noted that Plaintiff was taking 20 mg Celexa for depression.  *Id.* at 59.  Upon evaluation, Nurse McGinnis noted that Plaintiff was oriented to person, place, time, and situation, his appearance was appropriate, and hygiene well kept.  *Id.* at 60.  She noted that Plaintiff's thought processes were coherent, logical and goal directed, and he did not express any hallucinations or suicidal ideations.  *Id.*  Defendant McGinnis' assessment was depression, and her plan was to increase Plaintiff's Celexa from 20 mg to 40 mg daily.

*Id.*  Plaintiff's Health Summary for Classification form dated February 24, 2011 includes a low bunk restriction for sixty (60) days.[5]  (D.E. 51-2, p. 90).

On July 26, 2011, Plaintiff was seen via telemed by Nurse McGinnis for his routine follow-up psychiatric evaluation. (D.E. 51-2, pp. 3-8).  Plaintiff reported that his current cellmate was complaining about Plaintiff's restless sleep, and that his nightmares and actions had caused his roommates to seek a transfer out of the cell.  *Id.* at 4.  He stated that the Celexa made him feel tense.  *Id.*  He claimed that three nights before this appointment, he had a "seizure" and fell out of his bunk hitting the floor face first, and that he briefly lost consciousness.  *Id.*  He related that, thirty (30) years prior, he had been diagnosed with a seizure disorder.  *Id.*

Nurse McGinnis observed that Plaintiff was ambulatory, alert, and in no apparent distress.  (D.E. 51-2, p. 4).  He had a small periorbital hematoma, but no abrasions on his face.  *Id.*  She did not observe any discoloration or abrasions on his chest, and no chest deformities suggesting rib damage were noted.  *Id.*  Nurse McGinnis' assessment was fall from top bunk three days ago, with possible seizure episode of unknown origin or maybe a psych or medication issue.  *Id.*  Her plan was to issue a low bunk pass for sixty (60) days, stop the Celexa, and begin Plaintiff on Prozac for his depression.  *Id.* at p. 6.

---

[5] Plaintiff's Health Summary for Classification form dated March 14, 2011 included a low bunk restriction for thirty-eight (38) days.  (D.E. 51-2, p. 89).  His April 22, 2011 Health Summary for Classification form reflected that the low bunk restriction had expired.  (D.E. 51-2, p. 88).  Plaintiff's Health Summary for Classification form dated May 17, 2011, included a low bunk restriction for ninety (90) days.  (D.E. 51-2, p. 87).

On July 28, 2011, Plaintiff's Health Summary for Classification form was updated to reflect a ninety (90) day low bunk restriction. (D.E. 51-2, p. 86). However, Plaintiff's Health Summary form dated August 16, 2011 indicates that the low bunk restriction was removed. *Id.* at 85.

On October 25, 2011, Plaintiff was seen via telemed by Nurse McGinnis for a routine follow-up psychiatric evaluation. (D.E. 51-2, pp. 64-68). Plaintiff reported that he was doing "okay." *Id.* at 65. Ms. Maldonado's plan was to continue Plaintiff on Prozac, and to have him return in six (6) months. *Id.* at 67. She also ordered lab work to evaluate his thyroid function. *Id.*

On November 21, 2011, Plaintiff was seen by Mental Health Services via telemed in response to a SCR complaining of "real vivid dreams and hallucinations that cause me to fall off the bunk." (D.E. 51-2, pp. 9-12). Counselor Maldonado asked Plaintiff if he wanted a lower bunk and Plaintiff said he just wanted the provider [Nurse McGinnis] "to do something different with the meds to stop the dream and hallucinations." *Id.* at 10. Counselor Maldonado pointed out that Plaintiff had just seen Nurse McGinnis the week before and asked why he did not tell her about his problems with his medications. *Id.* Plaintiff appeared "agitated" and related that he believed all of the mental health care personnel were ignoring him. *Id.* Counselor Maldonado suspected that Plaintiff was attempting to get a single-man cell, a bottom bunk, or away from some other situation, but was unwilling to ask for it directly. *Id.* She noted: "Offender presents as manipulative and demanding and attempting to use threats and intimidation to try to get

his needs met." *Id.* Ms. Maldonado's plan was to retain Plaintiff as a mental health care patient and remind him of the services available. *Id.*

On January 3, 2012, Plaintiff was seen via telemed by Nurse McGinnis after submitting a SCR seeking medical treatment for "…bad dreams … nightmares…, don't know what is causing this … hurting self in sleep…" (D.E. 51-2, pp. 14-16). Plaintiff told Nurse McGinnis that he began having nightmares in December 2010 after his mother died, and that his dreams were so violent he would fall out of his bunk. *Id.* at 15. He related that he told Mental Health Services as well as medical staff at the infirmary but they were all indifferent to his claims. *Id.* Plaintiff told Nurse McGinnis that he was not trying to get a lower bunk restriction, but that he was concerned for his safety and health, and that he was fearful about going to sleep because he might fall from his top bunk. *Id.* Nurse McGinnis' plan was to refer Plaintiff to a Mental Health Nurse Practitioner for chart review "to determine if medication adjustments are warranted to decrease vivid dreams and sleep episodes." *Id.* Plaintiff was also encouraged to seek medical assistance. *Id.* Plaintiff denied any further mental health concerns. *Id.* He denied auditory or visual hallucinations, and denied suicidal or homicidal ideations. *Id.*

On April 12, 2012, Plaintiff was seen via telemed by Nurse McGinnis for routine follow-up psychiatric evaluation. (D.E. 51-2, pp. 17-22). Plaintiff continued to complain of nightmares, and he related that, in the past, he had been sexually abused and shot. *Id.* at 17. Nurse McGinnis provided instruction and written materials on "how to change nightmares." *Id.* Nurse McGinnis reported that Plaintiff was oriented to person, place, time and situation; his appearance was appropriate; he was cooperative; and his thought

processes were coherent, logical, and goal directed. *Id.*at 18.   Nurse McGinnis'
assessment was "does not endorse depression." *Id.* at 19.  Plaintiff was continued on his
current medication regimen, and scheduled to return in six (6) months. *Id.* at 20.

On April 25, 2012, Plaintiff was seen via telemed by Nurse McGinnis in response
to a SCR.  (D.E. 51-2, pp. 31-33).  Plaintiff complained that he was still having "real
intense dreams/nightmares" and that he fell from his bunk the night before, despite
employing the therapeutic suggestions such as wedging himself into the bunk to change
his nightmares.  *Id.* at 31.  Plaintiff told Nurse McGinnis that he was fearful about aging
and "afraid to sleep" because it had become a safety issue. *Id.* at 32.  Plaintiff requested a
low bunk pass and stated that the Mental Health Nurse Practitioner agreed that the low
bunk restriction would be a possible addition to his mental health care regimen.[6]  *Id.*
Plaintiff related that his antidepressant was effective for his depressive symptoms.  *Id.*
Nurse McGinnis characterized Plaintiff's demeanor as genuine and noted that he was
willing to participate in self-help.  *Id.* at 33.  Her plan was to refer Plaintiff's chart to a
Mental Health Nurse Practitioner for review "due to continued night-mares/thrashing,
requesting bottom bunk and/or addition to regimen." *Id.*

On May 2, 2012, Plaintiff's Health Summary for Classification form did not
include a low bunk restriction.  (D.E. 51-2, p. 84).

On May10, 2012, Plaintiff was seen by Nurse McGinnis via telemed for a routine
follow-up psychiatric evaluation.  (D.E. 51-2, pp. 23-28).  Plaintiff complained that he

---

[6] Plaintiff's medical records do not include his meeting with a Mental Health Nurse Practitioner.

was having nightmares and falling out of his bed, and he wanted a bottom bunk.  *Id.* at 23-24.  Nurse McGinnis continued Plaintiff on his Prozac.  *Id.*

On May 14, 2012, Plaintiff submitted a SCR to the McConnell Unit infirmary stating that Nurse McGinnis told him that he should seek the low bunk pass from medical services, rather than from Mental Health Services.  (D.E. 51-2, p. 69).

On May 15, 2012, Plaintiff was seen by Dr. Whitt in the McConnell Unit infirmary in response to his request for a low bunk pass.  (D.E. 51-2, pp. 34).  Plaintiff again related that he was told by Nurse McGinnis to ask medical for the low bunk pass, but he admitted that his nightmares were not related to a medical condition and that he did not have a seizure disorder.  *Id.*  Dr. Whitt noted that Plaintiff had a history of nightmares for over a year, but no underlying medical condition to justify a bottom bunk. *Id.*  Dr. Whitt told Plaintiff that the bottom bunk order would need to come from the Psych Department.  *Id.*

On July 17, 2012, Plaintiff was seen in the McConnell Unit infirmary for a cut on his left great toe that he sustained getting off his top bunk.  (D.E. 51-2, pp. 94-98).  The wound was cleaned and Plaintiff was released to security.  *Id.* at 96, 97.

On September 5, 2012, Plaintiff's Health Summary for Classification form did not include a low bunk restriction.  (D.E. 51-2, p. 83).

On December 5, 2012, Plaintiff was seen by James Holtzclaw, a mental health care clinician, for complaints of "attempting to sleepwalk off of my bunk at night."  (D.E. 51-2, pp. 35-39).   Plaintiff complained that he had seen both medical and mental health care providers in the past, but had received no help for sleepwalking and that neither

department would issue him a lower bunk pass.  *Id.* at 36.  Mr. Holtzclaw told Plaintiff that the mental health services delegated bunk assignment to security.  *Id.*  Plaintiff related that the sleepwalking started after his mother's death, and Mr. Holtzclaw opined that Plaintiff's sleepwalking could be trauma related and he offered Plaintiff "insight on how he may start working on resolving this interference into his sleep and bodily motor actions, which may very well lead to resolving symptoms."  *Id.*  Mr. Holtzclaw noted that Plaintiff "presented very close-minded" and basically demanded medication as the only solution.  *Id.*

On January 18, 2013, Plaintiff filed a SCR directed to Nurse McGinnis stating that he was still having problems with his dreams and sleepwalking, and reporting that he had fallen on January 14, 2013.   (D.E. 51-2, p.77).   The response from Mental Health Services states that Plaintiff had now been assigned a bottom bunk.  *Id.*

On February 27, 2013, Plaintiff submitted a SCR to Mental Health Services stating that the low bunk restriction had not been entered into the computer.  (D.E. 51-2, p. 75).

On March 6, 2013, plaintiff submitted a SCR stating that he had talked to psych and medical on numerous occasions about sleepwalking and getting a lower bunk pass, but to date, he had not received the pass, and it was causing him anxiety.  (D.E. 51-2, p. 74).

On March 27, 2013, Plaintiff was seen via telemed by Nurse McGinnis for his routine follow-up psychiatric evaluation.  (D.E. 51-2, pp. 46).  Plaintiff stated that he was depressed and had thoughts about suicide, and he wanted a lower bunk due to his falling.  *Id.* at 42.  Nurse McGinnis' plan was to adjust Plaintiff's medications.  *Id.* at 44.

On Aril 15, 2013, Plaintiff reported to the McConnell Unit infirmary complaining of sleepwalking and claiming that he had fallen out of bed the night before, injuring his neck and left knee.  (D.E. 51-2, p. 47, 70-71).  Upon examination, Dr. Whitt noted no abnormality of the neck, but diagnosed a left-knee sprain and ordered an x-ray of his knee.  *Id.* at p. 70.  In addition, Dr. Whitt prescribed crutches, a low bunk pass, and Motrin for two weeks, and instructed Plaintiff to return in two weeks for follow-up.  *Id.* On April 16, 2013, Plaintiff's Health Summary for Classification form reflected the two weeks lower bunk restriction.  (D.E. 51-2, p. 82).

On April 17, 2013, Plaintiff submitted a SCR complaining that he was still thrashing and walking in his sleep and requesting that he be sent somewhere to get help. (D.E. 51-2, p. 73).

On April 26, 2013, Plaintiff returned to the McConnell Unit infirmary for his two-week follow-up visit with Dr. Whitt.  (D.E. 51-2, pp. 48-49).  Plaintiff reported that his knee still hurt but that he could ambulate without crutches.  *Id.* at 48.  Plaintiff related that he was regularly falling out of his bunk but not usually getting injured, and also that he experienced sleepwalking and sometimes performed tasks such as brushing his teeth or putting on boots during these episodes.  *Id.*  His cellmate told him he snores loudly, but he had no history of sleep apnea or gasping for his breath.  *Id.*  Upon examination, Dr. Whitt noted that Plaintiff's left knee had a large hematoma, but it was unable to drain due to a large clot.  *Id.*  The joint was stable and his x-ray was negative for fracture.  *Id.*  Dr. Whitt's assessment was Somambulance and she listed the possible causes as hypomagnesemia, arrhythmia, GERD, anxiety, medications, asthma, seizures, and/or

sleep apnea.  *Id.*  Dr. Whitt's plan was to order a permanent low bunk assignment and lab work, request a sleep study, and to begin Plaintiff on Nortriptyline to see if this medication reduced his sleepwalking episodes.  *Id.*

On April 29, 2013, Plaintiff's Health Summary for Classification form included the permanent lower bunk restriction.  (D.E. 51-2, p. 79).

On May 12, 2013, Plaintiff submitted a SCR to Dr. Whitt asking why his Nortriptyline had been discontinued as he had not experienced a sleepwalking episode since he started the medication.  (D.E. 51-2, p. 50).

On July 8, 2013, Plaintiff filed this lawsuit.  (D.E. 1).

On July 18, 2013, Plaintiff submitted a SCR inquiring about a sleep study.  (D.E. 51-2, p. 72).

On September 13, 2013, Plaintiff filed a SCR complaining that, in addition to a low bunk, he was supposed to be housed on the ground floor only.  (D.E. 51-2, p. 99). The response from medical states: "no indication for bottom row restriction."  *Id.*

## IV.    Summary judgment Standard

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.  In making this determination, the Court must consider the

record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion. *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).  The Court may not weigh the evidence, or evaluate the credibility of witnesses.  *Id.*  Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e); *see also Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider hearsay evidence in affidavits and depositions).   Unauthenticated and unverified documents do not constitute proper summary judgment evidence.  *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings.  Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248.  "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be

granted." *Caboni*, 278 F.3d at 451.  "If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed." *Anderson*, 477 U.S. at 250-51.

The usual summary judgment burden of proof is altered in the case of a qualified immunity defense.  *See Milchalik v. Hermann*, 422 F.3d 252,262 (5th Cir. 2005).  When a government official has pled the defense of qualified immunity, the burden is on the plaintiff to establish that the official's conduct violated clearly established law.  *Id.* Plaintiff cannot rest on his pleadings; instead, he must show a genuine issue of material fact concerning the reasonableness of the official's conduct.  *Bazen v. Hidalgo County,* 246 F.3d 481, 490 (5th Cir. 2001).

## V.    Discussion

Defendants move for summary judgment on the grounds of qualified immunity. (D.E. 50, p. 6).  Each argues there is no genuine issue of a material fact that she was not deliberately indifferent to Plaintiff's serious medical needs, but to the contrary, provided appropriate and timely medical treatment to Plaintiff and did not violate his Eighth Amendment rights.   In the alternative, Defendants argue that their conduct was objectively reasonable under the particular facts and circumstances of this case such that they are entitled to immunity and dismissal of Plaintiff's claims against them.  *See Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985) ("The [qualified immunity] entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.") (emphasis in original).

The doctrine of qualified immunity affords protection against individual liability for civil damages to officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).   When a defendant invokes the defense of qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc).   To discharge this burden, the plaintiff must satisfy a two-prong test.   *Atteberry v .Nocana Gen. Hosp.,* 430 F.3d 245, 251-52 (5th Cir. 2005).  First, the plaintiff must claim that the defendants committed a constitutional violation under current law.  *Id.* (citation omitted). Second, the plaintiff must claim that defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of.  *Id.* While it will often be appropriate to conduct the qualified immunity analysis by first determining whether a constitutional violation occurred and then determining whether the constitutional right was clearly established, that ordering of the analytical steps is no longer mandatory.  *Pearson*, 555 U.S. at 236 (receding from *Saucier v. Katz*, 533 U.S. 194 (2001)).

### Step 1 – Constitutional Violation

The Eighth Amendment imposes a duty on prison officials to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal

quotation omitted).  A prison official violates this duty when by act or omission he is deliberately indifferent to prison conditions which pose a substantial risk of serious harm. *Id.* at 834.

In order to state a § 1983 claim for denial of adequate medical treatment, a prisoner must allege the official(s) acted with deliberate indifference to serious medical needs.  *Wilson v. Seiter*, 501 U.S. 294, 303(1991); *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991).  Deliberate indifference encompasses more than mere negligence on the part of prison officials.  *Farmer*, 511 U.S. at 837.  It requires that prison officials be both aware of specific facts from which the inference could be drawn that a serious medical need exists and then the prison official, perceiving the risk, must deliberately fail to act.  *Id.*  Furthermore, negligent medical care does not constitute a valid § 1983 claim.  *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).  *See also Graves v. Hampton*, 1 F.3d 315, 319 (5th Cir. 1993) ("[i]t is well established that negligent or erroneous medical treatment or judgment does not provide a basis for a § 1983 claim").  As long as prison medical personnel exercise professional medical judgment, their behavior will not violate a prisoner's constitutional rights.  *Youngberg v. Romeo*, 457 U.S. 307, 322-23 (1982).  Finally, active treatment of a prisoner's serious medical condition does not constitute deliberate indifference, even if treatment is negligently administered.  *See Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999); *Mendoza*, 989 F.2d at 195; *Varnado*, 920 F.2d at 321.  Deliberate indifference is an "extremely high standard to meet."  *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).  The decision whether to provide additional treatment is "a

classic example of a matter for medical judgment." *Gobert v. Caldwell*, 463 F.3d 339,

346 (5th Cir. 2006).

The summary judgment evidence establishes that Plaintiff had a serious medical

need as early as December 2010 when he began falling from his bunk during the night.

Offender James McLaughlin was Plaintiff's cellmate on July 17, 2012, the day Plaintiff

cut his left big toe getting down from his bunk.  (D.E. 34, p. 1).  Offender McLaughlin

was reading at the time.  *Id.*  Plaintiff had been sleeping but he thought someone had

called for him causing him to exit his bunk.  *Id.*  According to Offender McLaughlin, no

one had called for Plaintiff.  *Id.*  Offender McLaughlin testified that he "had to grab

[Plaintiff] many times at night and wake him to keep him from falling."  *Id.* When

Plaintiff fell on April 15, 2013, Offender McLaughlin told Plaintiff to stay down and wait

for medical and noted that Plaintiff "didn't know what had happened." *Id.*

Offender Preston states that he moved into a cell with Plaintiff after his April 15,

2013 fall.  (D.E. 34, p. 2).  Plaintiff was on crutches and his knee was swollen.  *Id.*

Offender Preston observed Plaintiff talk to himself and move around while asleep.  *Id.*

One night Plaintiff got up and fell head first into the desk in their cell.  *Id.*   Sometimes,

Preston would hit Plaintiff with a towel to wake him.  *Id.*

At the evidentiary hearing, Plaintiff testified that his nightmares and sleepwalking

caused him severe anxiety.  He was afraid to go to sleep at night because he never knew

if he would fall out of his bunk and injure himself.  In addition, his cellmates got angry at

him for disrupting their sleep and they would eventually seek a transfer out of Plaintiff's

cell.  Plaintiff did not know the cause of his troubled sleep, and he described it in his SCR

as nightmares, vivid dreams, and sleepwalking, and opined that it might be caused by his antidepressants or a return of seizure activity that he suffered as a child.  He sought help from both his mental health care providers as well as from medical personnel, and his complaints are well documented.  Plaintiff's sleepwalking presents a serious medical need and both Nurse McGinnis and Dr. Whitt were eventually made aware of this serious medical need. However, the uncontested summary judgment evidence does not support Plaintiff's allegation that either Defendant ignored his serious medical needs.

Nurse McGinnis was made aware of Plaintiff's December 2010 fall from his bunk at his February 24, 2011 telemed appointment.  (D.E. 51-2, pp. 59-63).  However, in his related SCRs, Plaintiff complained that he started having the problems after his antidepressant medication was changed from Zoloft to Celexa, and Dr. Herrera had told him to bring his complaint to the attention of Mental Health Services.  (*See* D.E. 51-2, p. 51; D.E. 51-2, p. 55).  Thus, at the February 24, 2011 appointment with Nurse McGinnis, Plaintiff blamed his nighttime troubles on his antidepressant, and Nurse McGinnis responded by increasing the Celexa dosage from 20 mg to 40 mg, and she ordered a lower bunk pass for sixty (60) days.  (D.E. 51-2, p. 62, 90).

Nurse McGinnis saw Plaintiff again on July 26, 2011 and Plaintiff reported that he had fallen from his bunk three days before, hitting his face.  (D.E. 51-2, p. 4).  Nurse McGinnis changed Plaintiff's medication to Prozac and ordered a lower bunk pass for sixty days.  *Id.*  There is no record to suggest that Plaintiff reported to the McConnell Unit infirmary for medical treatment for his July 2011 fall, let alone that Dr. Whitt saw him.

In November 2011, Plaintiff complained to mental health services in a SCR of vivid hallucinations and falling out of his bunk. (D.E. 51-2, p. 9). Ms. Maldonado pointed out that Plaintiff had seen Nurse McGinnis the month before and had not made any of those complaints at that appointment. *Id.* at 10. Ms. Maldonado believed that Plaintiff was attempting to get a lower bunk pass or single-man cell for non-medical reasons. *Id.*

In January 2012, Nurse McGinnis told Plaintiff that if he was having difficulty sleeping, he should direct those complaints to medical. (D.E. 51-2, p. 12). When she saw him again on April 25, 2012, Plaintiff reported that he was doing "okay," and he was continued on his current medications. *Id.* at p. 18.

The first record of Dr. Whitt seeing Plaintiff is dated May15, 2012. (D.E. 51-2, p. 34). Plaintiff complained of nightmares causing him to fall from his bunk. *Id.* Dr. Whitt reviewed Plaintiff's medical file and found no record of a seizure disorder and no underlying condition for his nightmares. *Id.* On that basis, Dr. Whitt found no medical indication for a bottom bunk and stated that a bottom bunk restriction would need to come from Mental Health Services. *Id.*

Although Plaintiff continued to have difficulties, he did not fall from his bunk again during his sleep until April 2013, and at his appointment on April 26, 2013 with Dr. Whitt, she specifically addressed Plaintiff's sleepwalking disorder. (D.E. 51-2, pp. 48-49). Dr. Whitt listed possible causes and proposed a plan to determine the cause while simultaneously treating the symptoms. *Id.*

The record does establish grounds for plaintiff to become frustrated: Mental Health Services instructed him to seek a lower bunk pass from medical, while medical told him that such a pass should come from Mental Health Services. However, the failure of either Nurse McGinnis or Dr. Whitt to properly diagnose Plaintiff or recognize his complaints as "sleepwalking," versus a seizure disorder or medication issue does not amount to deliberate indifference. To the contrary, the record establishes that both Defendants attempted to address Plaintiff's problems and to offer him some relief.

Upon his review of Plaintiff's medical records, Defendants' expert witness, Dr. Bowers, concludes that Dr. Whitt and Nurse McGinnis provided appropriate medical treatment and performed within the recognized standard of care for physicians and nurses, and acted in good faith. (D.E. 51-1, pp. 2-5, Bowers Aff't at § 12). Dr. Bowers summarizes:

> ... Mr. Wilson was seen by medical and mental health personnel on numerous occasions. The medication Mr. Wilson was on in December 2010 was an antidepressant and should not cause nightmares or sleep walking as claimed by Mr. Wilson. In fact, Mr. Wilson's story changed twice since December 2010, because he first reported seizure activity, then it was nightmares only, and then progressed to nightmares and sleepwalking. The record notes the patient denied wanting a bottom bunk until May 10, 2012, and medical and mental providers appeared confused about what the patient was seeking. The patient received counseling in an effort to relieve his nightmares and was given a low bunk in December 2012. The knee injury sustained by Mr. Wilson (April 2013) occurred after he was given a low bunk. After December 2012, there is no record of Mr. Wilson asking for a low bunk restriction.

(D.E. 51-1, pp. 2-5, Bowers Aff't at § 11).

Plaintiff was seen on a regular basis by Nurse McGinnis and she took his complaints seriously and attempted to help him through medication and counseling. The

second time Dr. Whitt had the opportunity to examine Plaintiff, she recognized his sleepwalking and opined possible causes and a plan for diagnosis and treatment. Plaintiff was never denied medical attention.

### *Step 2 – Objective Reasonableness*

Because Plaintiff has failed to state a constitutional violation as to either Defendant the Court need not examine whether their actions were objectively reasonable. *See Saucier*, 533 U.S. at 201 (if the facts alleged do not establish that the officer's conduct violated a constitutional right, then the qualified immunity analysis need proceed no further and qualified immunity is appropriate). Thus, it is respectfully recommended that Defendants' be granted summary judgment in their favor as to plaintiff's §1983 claims of deliberate indifference to his serious medical needs and those claims dismissed with prejudice.

## VI.    Recommendation

There is no genuine issue of a material fact that Defendants were not deliberately indifferent to Plaintiff's serious medical needs. Thus, it is respectfully recommended that Defendants' motion for summary judgment (D.E. 50) be granted, and that Plaintiff's claims be dismissed with prejudice.

Respectfully submitted this 11th day of July, 2014.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996)(en banc).